# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

DARIAN DUNSTON,

    Plaintiff,

v.                                      Case No. 5:18-cv-90-MCR/MJF

W CHURCHWELL, et al.,

    Defendants.

_____/

## REPORT AND RECOMMENDATION

This prisoner civil rights case is before the court on Defendants Kelly and Holden's motion to dismiss (Doc. 17), and Defendant Churchwell's identical motion to dismiss (Doc. 28). Plaintiff filed separate, identical responses to the motions. (Docs. 22, 35). The undersigned concludes that the Defendants' motions to dismiss should be granted and that this case should be dismissed for failure to state a claim on which relief may be granted and because the Defendants are entitled to qualified immunity.[1]

---

[1] The case was referred to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

I.      **Background and Procedural History**

Plaintiff Darian Dunston is an inmate of the Florida Department of Corrections currently confined at Mayo Correctional Institution Annex. Dunston was confined at the Northwest Florida Reception Center ("NWFRC") at the time of the events giving rise to this lawsuit. Dunston is suing three prison officials previously employed at NWFRC: Warden W. Churchwell, Assistant Warden N. Kelly, and Correctional Major J. Holden. Dunston claims that the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishments. Specifically, Dunston contends that, in August 2013, while he was being held in disciplinary confinement, he informed the Defendants that gang members threatened to kill him upon his release into the general prison population. Dunston claims that despite being confronted with this information, the Defendants failed to take reasonable steps to abate the threat. Dunston asserts that eight months after reentering the general population, he was attacked by two inmates—one of whom was a known gang member. As relief, Dunston seeks $425,000.00 in compensatory and punitive damages from each Defendant. (Doc. 1).

The Defendants move to dismiss Dunston's complaint under Federal Rule of Civil Procedure 12, on three grounds: (1) the Defendants are entitled to qualified immunity; (2) Dunston's allegations fail to state a facially plausible deliberate indifference claim under the Eighth Amendment; and (3) Dunston's damages claims

are barred by 42 U.S.C. § 1997e(e). (Doc. 17, pp. 5-12; Doc. 28, pp. 5-12). Dunston opposes the Defendants' motions on each point. (Docs. 22, 35).

## II.     Relevant Legal Principles

### A.     Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure authorizes dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The mere possibility that the defendant acted unlawfully is insufficient. *Id.*; *see also* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (noting that a "pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action").

The complaint must include "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, that is, "across the line from conceivable to plausible." *Id.* at 570; *see also Iqbal*, 556 U.S. at 678 (reiterating that although Rule 8 of the Federal Rules of Civil Procedure does not

require detailed factual allegations, it demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). A complaint also may be dismissed for failure to state a claim "when its allegations, on their face, show that an affirmative defense bars recovery on the claim." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003); *see also Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001); *Jones v. Bock*, 549 U.S. 199, 215 (2007) (reiterating that principle).

In considering a motion to dismiss for failure to state a claim, the court accepts all well-pleaded factual allegations in the complaint as true and evaluates all reasonable inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1483 (11th Cir. 1994). Mere "labels and conclusions," however, are not accepted as true. *Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (explaining that on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"); *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (holding that courts must follow the Supreme Court's "'two-pronged approach' of first separating out the complaint's conclusory legal allegations and then determining whether the remaining well-pleaded factual allegations, accepted as true, 'plausibly give rise to an entitlement to relief.'" (quoting *Iqbal*, 556 U.S. at 679). Thus, a pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

B. **Qualified Immunity Standard**

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)). Once that is shown, "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate." *Id*. The plaintiff must prove that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, ___ U.S. ___ , 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The Eleventh Circuit "has repeatedly

held that a district court may dismiss a case on the basis of qualified immunity at the Rule 12 stage." *Trotter v. Shull*, 720 F. App'x 542, 543 (11th Cir. 2017) (citing *Cottone*, 326 F.3d at 1357; *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003); *Skrtich v. Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002)).

### C.  Eighth Amendment Deliberate Indifference Standard

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks and citations omitted). However "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. It is only a "prison official's <u>deliberate indifference to a substantial risk of serious harm</u> to an inmate [that] violates the Eighth Amendment." *Id*. at 828 (emphasis added).

"Deliberate indifference in the context of a failure to prevent harm has a subjective and an objective component, i.e., a plaintiff must show both that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and that the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner." *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016); *Marsh*, 268 F.3d at 1027 ("[O]fficials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk."). "[P]rison officials who actually knew

of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

## III. Discussion

Dunston claims that Churchwell, Kelly, and Holden were deliberately indifferent to a substantial risk of serious harm to him. Specifically, on August 20, 2013, while serving a 60-day term of disciplinary confinement, Dunston notified the Defendants through an emergency grievance that members of several gangs put a "hit" on his life. According to Dunston's complaint, the Defendants' subjective awareness of the risk of harm derived solely from the August 20, 2013, emergency grievance he addressed to the Warden.[2] This court, therefore, recites that grievance verbatim:

> Im writing this grievance in concerns of the threats the bloods, crips, folks, Muslims, and latin kings and my actions as well. I've been incarcerated since Oct. 21, 2000 and my means of living being confined is take or rob by any means necessary to survive. I've had many promblems during my time of despair with my aggressive attitude as far as physical fighting, knife fights, and near death encounters and I've been blessed not to be physically harmed. I know what I do is wrong but a man of my caliber will make ends meet to survive in prison. Don't get me wrong, I'm aware of the consequences that will eventually come in my path by the way I choose to live in prison but I'm always prepared for the worst. However, here at N.W.F.R.C. I have physically taken drugs, cell phones, and even cash money either by knife or physical contact to keep food in my locker from the muslims, crips, bloods,

---

[2] The emergency grievance was signed by Dunston on August 8, 2013, and received by the Assistant Warden's Office on August 20, 2013. (Doc. 1, Attach. A).

> folks, and latin kings because I do not discriminate and also because I'm a lone wolf that's not affiliated with no particular sect (gang) and I'm determined to survive with the heart of a lion and the hunger of a hyhenna. Since I've been in confinement this time I've been receiving little notes from the compound by these gangs stating that they have a 2500 hundred dollar hit on my head and that I bet not come back to the pound. They also stated in their little notes that they've contacted their other brothers in surrounding areas in this region – A.C.I., Swanni, Columbia, and Okaloosa so there's no place I can hide. I'm not trying to hide and all those dudes know just that, but I guess they're trying to scare or spook me because why tell someone what you got on their head if you really wanna see blood? To be honest, I'm not scared for my life because I know and they know what I'm capable of doing, but I'm afraid it will eventually come to me having to take someone else's life because I refuse to let someone or group take my life. Also, I'm not scared to go back to the compound either because I will not procrastinate to take a life or lives if someone is trying to take my life or inflict bodily harm towards me. The courts sentence me to natural life in prison and that's one of the reasons why I choose to live on the edge, but in the meantime if I'm placed in a position that will cause me to take a life for defending my life here at this camp then I will not hesitate. I've noticed my family and informed them on this situation because they already know how I live in prison which the oppose of course. I'm also writing this grievance to you so I can have it documented that I informed this institution of this matter for future problems, assaults, or even death, so it can be noted in my inmate file because it's no telling what the outcome of my past and future thug actions may bring. Basically, what I'm saying, its kill or be killed because I'm not checking for <u>NO ONE</u>.
>
> P.S. I'm in the process of noticing F.D.L.E. about this matter.

(Doc. 1, Attach. A, pp. 2-3) (spelling, grammatical and punctuation errors in original).[3]

---

[3] Dunston attached a copy of his emergency grievance to his complaint. The grievance, therefore, is considered part of the pleadings. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading

In his grievance, Plaintiff did not use the term "protective management," did not request placement in protective segregation, and did not request transfer to another prison. Plaintiff already was in disciplinary segregation, and thus safe from any attacks. The Warden's office designated Dunston's grievance as involving a "Security" issue, and forwarded the grievance to "Security". (Doc. 1, Attach. A, p. 2). Dunston's grievance was received by the Assistant Warden's Office on August 20, 2013. (Doc. 1, Attach. A, p. 2).

Assistant Warden Kelly and Major Holden responded to the grievance on August 29, 2013, as follows:

> Your grievance was received and reviewed. The following response is provided:
>
> Your allegations have been reported to the Inspector General's Office for further review and disposition as they see fit[.] [B]e advised this may or may not result in a personal interview with an inspector.
>
> Based on the foregoing information, your grievance is approved.

(Doc. 1, Attach. A, p. 4). On August 29, 2013, the Defendants referred the grievance to the Inspector General's Office (Doc. 1, pp. 7-8, ¶¶ 6-9).[4]

---

for all purposes."); *see Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) ("When considering a motion to dismiss, all facts set forth in the plaintiff's complaint are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.") (quotation marks omitted).

[4] Citations to page numbers are to those assigned by the court's Electronic Case Filing system ("ECF").

On October 7, 2013, prison officials released Dunston from disciplinary confinement to the general population. (Doc. 1, p. 8, ¶ 10). For over ten months, nothing happened and Plaintiff did not follow up on his grievance or make a request for protective management or any type of protective segregation. On June 24, 2014—more than ten months after he filed his grievance—two inmates (Chrisshaw Arrington and Omar Alberga) attacked Dunston. (Doc. 1, p. 9, ¶¶ 11-16). According to Plaintiff, Arrington was "a very violent known gang member at N.W.F.R.C." (Doc. 1, p. 9, ¶ 17).

### A.  Dunston's Claim Against Warden Churchwell

Dunston claims that Warden Churchwell was deliberately indifferent to the substantial risk of harm brought to light by his grievance, because Churchwell "took no action at all and instead merely passed this grievance off to Defendant Kelly and Defendant Holden, as members of the ICT, to resolve." (Doc. 1, p. 8, ¶ 7). Dunston explains that he wrote the grievance "in the hopes that Defendant W. Churchwell would take action by way of placing the plaintiff in Administrative Confinement (A/C) pending investigation of the threats; pending review for placement in Protective Management (P/M); or pending review for Close Management (C/M)." (Doc. 1, pp. 7-8, ¶ 7). Despite plainly articulating his "hopes" now, however, he did not make his "hopes" to be placed in administrative confinement explicit in his grievance.

Even assuming, without deciding, that Dunston plausibly alleges the existence of two of the three elements of an Eighth Amendment claim (a substantial risk of serious harm and causation), his allegations do not plausibly show that Churchwell was deliberately indifferent. According to Dunston's complaint, Churchwell maintained Dunston in disciplinary confinement and referred his grievance to the Security department. Dunston argues that Churchwell should have placed him in administrative confinement pending an investigation. Administrative confinement "refers to the temporary removal of an inmate from the general population in order to provide for security and safety until such time as a more permanent inmate management decision can be concluded such as disciplinary confinement, close management, protective management or transfer." Fla. Admin. Code Ann. r. 33-602.221(1)(a).

Dunston, however, already was segregated from the general population by virtue of his disciplinary confinement. At the time he submitted his grievance, Dunston had just begun a 60-day stint in disciplinary confinement. (Doc. 22, p. 2, ¶ 2 n.1; Doc. 35, p. 2, ¶ 2 n.1). Disciplinary confinement is a more controlled environment than administrative confinement. *Compare* Fla. Admin. Code Ann. R. 33-602.222 (describing the conditions of disciplinary confinement), *with* Fla. Admin. Code Ann. R. 33-602.220 (describing the conditions of administrative confinement). Disciplinary confinement, therefore, was an adequate means of

ensuring Dunston's safety, and Dunston was not attacked while in disciplinary confinement. Thus, Dunston has not shown that Churchwell acted unreasonably in keeping Dunston in disciplinary confinement.

Churchwell's administrative decision to refer Dunston's grievance to the Security department also was not a grossly inadequate response or a response so cursory as to amount to no action at all, because Dunston's grievance raised a security issue. *See Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (stating, in the context of a medical deliberate indifference claim: "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."). Indeed, informing the Security department of a security threat seems eminently reasonable, as this course of action increased the knowledge among FDC personnel who knew of the threat. This action demonstrates that Churchwell made yet another effort to address Dunston's grievance. Taking actions in response to a complaint and to ensure an inmate's safety is not indifference. *See Farmer*, 511 U.S. at 844 (holding that a prison official is not deliberately indifferent when he "responded reasonably to the risk, even if the harm ultimately was not averted"); *Comstock v. McCrary*, 273 F.3d 693, 706 (6th Cir. 2001) (holding that responding reasonably to a risk is not deliberate indifference "even if the harm ultimately was not averted"). Accordingly, Dunston's complaint

has not sufficiently alleged deliberate indifference on the part of Churchwell. Because Dunston's complaint does not plausibly allege that Churchwell was deliberately indifferent to his safety, and he fails to satisfy the first prong of the qualified immunity standard, Dunston's Eighth Amendment claim against Churchwell should be dismissed.

### B. Dunston's Claim Against Assistant Warden Kelly and Major Holden

Dunston also claims that Assistant Warden Kelly and Major Holden were deliberately indifferent to the substantial risk of harm brought to light by his grievance, because they forwarded Dunston's grievance to the Inspector General's Office "instead of taking any steps to protect the plaintiff." (Doc. 1 at 8, ¶¶ 8, 9). Dunston alleges that Kelly and Holden are part of the Institutional Classification Team (ICT), which is tasked with "evaluat[ing] whether an inmate needs to be placed in a different status, other than general population, for his own protection or for the orderly functioning of the Institution." (Doc. 1, p. 6, ¶ 3; p. 7, ¶ 4; p. 8, ¶ 7). Dunston contends that because Kelly and Holden were members of the ICT, they should have construed his grievance as a request for protection and arranged for his placement in protective management or transfer to a different institution upon release from disciplinary confinement. (Doc. 1, p. 8, ¶ 10); *see also* Fla. Admin. Code Ann. r. 33-602.221(2) (procedures for placement in protective management).

Dunston's allegations do not support a reasonable inference that Kelly and Holden's referring his grievance to the Inspector General's Office was objectively unreasonable. Dunston's grievance documented gang activity, contraband, thefts committed by Dunston, violence, and Dunston's chosen "thug" lifestyle. Although the grievance also related that various gangs had placed a "hit" on Dunston and warned him not to return to the general population, Dunston also expressly told the Defendants that he was <u>not</u> in fear for his life, was <u>not</u> in fear of returning to the compound, and was <u>not</u> "trying to hide". (Doc. 1, Attach. A; *see also* Fla. Admin. Code Ann r. 33-602.220(3)(c) (providing that to invoke the procedures for protective management review, the inmate must "present[ ] a signed written statement alleging that the inmate fears for his safety from other inmates, and that the inmate feels there is no other reasonable alternative open to him."). The only action Dunston's grievance requested was that the grievance be placed in his inmate file "because it's no telling what the outcome of my past and future thug actions may bring." (Doc. 1, Attach. A, p. 3). Dunston's complaint does not allow this court to reasonably infer that Kelly and Holden's action was a grossly inadequate response, a decision to take an easier but less efficacious course, or a response so cursory as to amount to doing nothing. *See Bingham*, 654 F.3d at 1176.

With the benefit of hindsight, Dunston faults Kelly and Holden for failing to treat his grievance as a request for protection. However, nothing in Dunston's

complaint suggests that in the days intervening Kelly and Holden's August 29, 2013, response and his October 7, 2013, release from disciplinary confinement, Dunston either (1) made Kelly or Holden aware that he intended his grievance as a request for protection, or (2) otherwise communicated a desire for protective management review. The same is true of the 8 months following Dunston's release to the general population on October 7, 2013. Nothing in Dunston's complaint suggests that Kelly or Holden knew there remained a substantial risk of harm to Dunston despite their referral to the IG's Office.

A mere allegation that Kelly and Holden should have construed Dunston's grievance as a request for protection may indicate negligence, but negligence is insufficient to violate the Eighth Amendment. *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (noting that the deliberate indifference standard "is far more onerous" than the negligence standard). Because Dunston fails to plausibly allege that Kelly or Holden was deliberately indifferent to his safety, he fails to state a claim for an Eighth Amendment violation and fails to satisfy the first prong of the qualified immunity standard.

## IV.   Conclusion

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1. Defendant Churchwell's Motion to Dismiss (Doc. 28) be **GRANTED**.

2.  Defendants Kelly's and Holden's Motion to Dismiss (Doc. 17) be **GRANTED**.

3.  This case be **DISMISSED** under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim on which relief may be granted and because the Defendants are entitled to qualified immunity.

At Panama City, Florida, this 5<u>th</u> day of July, 2019.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**